**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIER BERMUDEZ, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| INC RESEARCH HOLDINGS, INC., MICHAEL A. BELL, ALISTAIR MACDONALD, MICHAEL GIBERTINI, and GREGORY S. RUSH, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Elier Bermudez ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by INC Research Holdings, Inc. ("INCR" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by INCR; and (c) review of other publicly available information concerning INCR.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that acquired INCR securities between May 10, 2017, and November 9, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     INCR provides Phase I to Phase IV clinical development services to pharmaceutical, biotechnology, and medical device companies.

3.     On August 1, 2017, the Company announced that it completed a merger (the "Merger") with inVentiv Health, Inc. ("inVentiv"). On that same day, the Company represented to investors that:

> The closing of this deal marks the beginning of an industry-changing new company, purpose-built to achieve the singular goal of accelerating biopharmaceutical performance. INC Research/inVentiv Health will address new market realities through shared clinical and commercial expertise, data and insights to meet the needs of biopharmaceutical companies of all sizes. This strategic combination enhances our ability to facilitate approvals and product launches in multiple markets worldwide, and the value we offer to employees, customers and our shareholders.

4.     On November 9, 2017, the Company reported Q3 2017 results that fell far below investors' expectations. The Company reported a Q3 net loss from operations of $88.9 million, compared to income from operations of $39.4 million for Q3 2016. According to the Company,

---

[1] "Defendants" refers to INCR, Michael A. Bell, Alistair Macdonald, Michael Gibertini, and Gregory S. Rush, collectively.

the operating results for Q3 2017 were impacted by Merger-related transaction expenses of $84.3 million, an impairment charge of $30.0 million with respect to the INCR trademark intangible asset, and an increase in amortization expense of $41.9 million due to the acquisition of intangible assets as a result of the Merger. The Company also projected Q4 2017 Clinical Solutions adjusted net service revenue to be between $525.0 million and $540.0 million; and Q4 2017 Commercial Solutions adjusted net service revenue to be between $225.0 million and $240.0 million. William Blair analyst, John Kreger, criticized the Company's performance, calling the Q3 results "sloppy." Kreger also criticized the Company's prospects, noting that the Company's fourth quarter guidance was "worrisome" given the challenges that inVentiv's commercial business had faced, and that "[t]he guidance implies that clinical revenues will be flat and commercial revenues will be down 21% year-over-year."

5.    On this news, the Company's stock price fell $16.35 per share, or 28.4%, to close at $41.15 per share on November 9, 2017, on unusually heavy trading volume. The Company's share price continued to fall over the next three trading sessions, closing on November 14, 2017 at $34.35 per share, a total decline of $23.15 per share, or 40.3%.

6.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Merger was not providing the benefit that Defendants stated it would; (2) that inVentiv was underperforming; (3) that, as a result, the Company's 2017 financial performance would be negatively impacted; and (4) that, as a result of the foregoing, Defendants' statements about INCR's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17

C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff Elier Bermudez, as set forth in the accompanying certification, incorporated by reference herein, purchased INCR securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant INCR is incorporated in Delaware.  INCR's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "INCR."

14.     Defendant Michael A. Bell ("Bell") was the Chairman and Chief Executive Officer ("CEO") of inVentiv from September 2014 until August 1, 2017. Bell was also INCR's Executive Chairman of the Board and the President of INCR's Commercial Division from August 1, 2017 through the end of the Class Period.

15.     Defendant Alistair Macdonald ("Macdonald") was the CEO of INCR at all relevant times.

16.     Defendant Michael Gibertini ("Gibertini") was the Chief Operating Officer ("COO") of INCR from October 2016 until August 1, 2017. Gibertini was the President of Clinical Development at INCR from August 1, 2017 through the end of the Class Period.

17.     Defendant Gregory S. Rush ("Rush") was the Chief Financial Officer ("CFO") of INCR at all relevant times.

18.     Defendants Bell, Macdonald, Gibertini, and Rush (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of INCR's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     INCR provides Phase I to Phase IV clinical development services to pharmaceutical, biotechnology and medical device companies.

### Materially False and Misleading Statements Issued During the Class Period

20.     The Class Period begins on May 10, 2017.   On that day, the Company issued a press release entitled "INC Research and inVentiv Health to Merge."   Therein, the Company, in relevant part, stated:

> INC Research Holdings, Inc., a leading global Phase I-IV Contract Research Organization ("CRO"), and inVentiv Health, Inc., a leading, privately held, global CRO and Contract Commercial Organization ("CCO"), today announced that their Boards of Directors have unanimously approved a definitive merger agreement pursuant to which their businesses would combine in an all-stock transaction, creating a leading global biopharmaceutical solutions organization. Based upon the closing price of INC Research common stock on Tuesday, May 9, 2017, the transaction values inVentiv at an enterprise value of approximately $4.6

billion, and the combined company at an enterprise value of approximately $7.4 billion.

Upon closing of the transaction, INC Research shareholders are expected to own approximately 53 percent and inVentiv shareholders are expected to own approximately 47 percent of the combined company on a fully diluted basis. Advent International and Thomas H. Lee Partners, two preeminent private equity firms, are currently equal equity owners of inVentiv and will remain investors in the combined company upon closing of the merger.

**Today's announcement creates:**

- The second largest biopharmaceutical outsourcing provider focused on creating value for customers, patients, physicians, payers and employees.

- A Top 3 CRO globally and the leading CCO provider focused on improving customer performance and accelerating new products to market. The combined company will have more than 22,000 employees spanning more than 60 countries, and will serve customers in more than 110 countries.

- Leadership positions in the growing CRO and CCO markets. The Commercial market represents an underpenetrated opportunity with only 16% penetration and outsourcing potential of $150 billion, providing substantial growth potential.

Upon completion of the transaction the combined company will leverage commercial insights to inform the clinical trial process, designing studies to be more efficient and effective to address evolving patient and payer needs. Commercial solutions informing accelerated clinical trial design include market access, data-driven Real World Evidence ("RWE"), advocacy relations and medical affairs. The new organization's combined clinical scale, therapeutic depth and expertise will allow it to partner with biopharmaceutical companies of all sizes to navigate an increasingly complex biopharmaceutical development and commercialization environment.

Alistair Macdonald, Chief Executive Officer of INC Research, said, "Today marks a significant milestone for INC Research. Customers are increasingly seeking simultaneous approvals and product launches in multiple markets worldwide. Through this strategic combination we are bringing together two of the most innovative and respected players in the field to create a leading global biopharma solutions organization with a full suite of clinical and commercial solutions to address the needs of biopharmaceutical companies, patients, physicians and payers. The combination of INC Research and inVentiv will expand our global scale and add capabilities to grow our addressable market." He continued, "Both companies have a history of successfully integrating acquisitions, and I am confident that we will capitalize on the many opportunities this combination creates for all stakeholders. We look forward to working closely

with the talented inVentiv employees, who share our dedication to making the world a better place by bringing new therapies to patients, while building significant value for our shareholders."

Michael Bell, Chief Executive Officer of inVentiv Health, said, "As biopharmaceutical companies of all sizes face increasingly complex challenges to bring products to market, they are seeking comprehensive outsourced solutions across the clinical and commercial spectrum. The new company is purpose-built to address market realities where clinical and commercial must work together, sharing expertise, data and insights, to improve client performance." He continued, "We believe this merger has significant client advantages as it deepens our scale, scope and therapeutic expertise. The combination also provides the opportunity to leverage INC Research's Trusted Process(R) - a proven methodology to accelerate success - which can improve the overall cost of development and time to market for our customers. We have long-admired INC Research, and this is an exciting opportunity to bring together two best-in-class, industry-leading teams who share the commitment to shorten the distance from lab to life."

**Benefits of the Merger**

- Offers customers a comprehensive suite of outsourced services across the drug development and commercialization continuum: INC Research's strong therapeutic focus and proven Trusted Process, combined with inVentiv's differentiated CRO/functional service provider ("FSP") and CCO capabilities, including selling solutions, communications, consulting and medication adherence, delivers a leading portfolio of services designed to address the evolving challenges of the biopharmaceutical industry.

- Competes in two highly attractive markets: The clinical development market served by CROs is expected to reach $36 billion by 2020, growing at an approximate 6 percent CAGR, while the CCO market is expected to reach $34 billion by 2020, growing at an approximate 8 percent CAGR, providing substantial growth potential.

- Creates a global leader in Phase I-IV clinical development: The combined company will become one of the Top 3 CROs globally. Scale is increasingly becoming a key consideration for CRO customers and the combined company will be well-positioned to capitalize on this dynamic. The transaction will expand the combined company's global presence in important strategic geographies such as Asia/Pacific and specifically Japan, where there is significant opportunity for growth. The combined company's global reach will enable it to continue to serve as a leading outsourcing partner on a full service, functional and hybrid basis to biopharmaceutical customers.

- Capitalizes on growing commercial outsourcing trend: The demand for

outsourced commercialization services is growing, with specialized knowledge and expertise increasingly required for the successful launch and commercialization of products. inVentiv is well-positioned to capitalize on this trend and enhance the clinical development process with commercial capabilities, including selling solutions, communications, consulting and medication adherence. inVentiv also has access to subject matter experts such as medical science liaisons ("MSL"), nurse educators, patient advocates and strategic consultants.

- Deepens therapeutic expertise: Both inVentiv and INC Research have significant therapeutic expertise in core areas, including oncology and central nervous system ("CNS"), which together represent a combined 2016 net revenue of over $1.2 billion. The merger will deepen the combined company's therapeutic experience in these complex disease areas and enhance expertise in areas such as cardiovascular, metabolic and respiratory diseases. Having therapeutic breadth and depth is an increasingly important factor in customers' outsourcing selection decisions.

- Improves access to data assets informing clinical and commercialization design and execution: The combination of inVentiv's pharmacy data through its Adheris pharmacy network, RWE programs and other data sets, along with INC Research's Real World & Late Phase business, site relationships, and predictive clinical data sets, increases the combined company's access to physicians, investigators and patients, generating actionable insights. These are all key factors to inform the design and execution of clinical development and commercialization programs.

- Serves a diversified and highly complementary customer base: INC Research's strong relationships and expertise providing services to small and mid-sized biopharmaceutical companies, combined with inVentiv's relationships with large biopharma, including all of the top 20 biopharma, will create a complementary and diversified customer base with leadership across large, mid-sized and small biopharma. INC Research and inVentiv have limited client overlap, and foresee no revenue dis-synergies. The companies see this merger as an opportunity to deepen client relationships and expand the combined company's share of outsourced clinical development and commercialization spend.

- Provides significant cost synergy potential: The transaction is estimated to achieve approximately $100 million in annual run-rate cost synergies, which the companies expect will be fully realized within three years.

- Creates cross-selling opportunities: INC Research and inVentiv can cross-sell their complementary services to their respective clients. INC Research's small to mid-sized biopharmaceutical clients will now be able to access inVentiv's comprehensive commercialization services, including selling solutions, communications, consulting and medication adherence.

This capitalizes on the growing trend for small to mid-sized companies to bring their own products to market. INC Research and inVentiv will be able to cross-sell their complementary clinical capabilities, including enhanced therapeutic expertise and service delivery models (full service, hybrid, and FSP).

- Provides accretion: The transaction is projected to be accretive to INC Research's adjusted earnings per share in the first 12 months following close, mid to high single-digit accretive in 2018 and  accretive by more than 20 percent in 2019 and beyond.

- Maintains strong balance sheet with robust free cash flow generation: With over $600 million of pro forma EBITDA for the Trailing Twelve Months ended March 31, 2017, and the expectation of approximately $100 million in annual run-rate cost synergies, plus the ability to realize nearly $850 million in NOLs, net leverage is expected to be reduced from approximately four times at closing to under three times within 18 months to two years of closing.

21.     On May 10, 2017, the Company issued a press release entitled "INC Research Reports First Quarter 2017 Results."  Therein, the Company, affirmed fiscal year 2017 guidance, and stated in relevant part:

"INC Research is off to a strong start in 2017, with record gross awards and continued expansion of capabilities in key areas of importance to our customers," said Chief Executive Officer Alistair Macdonald. "INC's ability to work in a variety of flexible outsourcing models - full service, functional service, or a hybrid of both - is resonating increasingly with our customers, as demonstrated by our robust awards and strategic partnership opportunities secured during the quarter."

He concluded, "I'd like to thank our nearly 6,900 employees worldwide for their efforts in helping us to deliver a strong first quarter and once again earn INC recognition as the 'Top CRO to Work With' among top 10 global CROs in the 2017 CenterWatch Global Investigative Site Relationship Survey. INC is proud to be the only CRO ranked among the top three in all CenterWatch site relationship surveys conducted over the past decade and believe this recognition is a strong testament to our support of and collaboration with sites in bringing new medicines to market for patients. We remain committed to enhancing our relationships with sites and all stakeholders across the clinical research community as we work to establish INC as the CRO of Choice."

**First Quarter 2017 Results**

Net service revenue for the three months ended March 31, 2017 increased by 1.2% to $252.1 million, compared to net service revenue of $249.0 million for the three months ended March 31, 2016. During the first quarter of 2017, our net

service revenue growth was primarily attributable to the increase in our FSP business. During the three months ended March 31, 2017, fluctuations in foreign currency exchange rates resulted in an unfavorable impact of $3.5 million on net service revenue compared to the same period in 2016.

Income from operations for the three months ended March 31, 2017 increased by 6.9% to $34.8 million, compared to $32.5 million for the three months ended March 31, 2016. Operating margin for the three months ended March 31, 2017 was 13.8% compared to 13.1% for the same period in 2016.

The Company's income from operations includes certain expenses and transactions that it believes are not representative of its core operations. Excluding these items, adjusted income from operations remained relatively flat at $52.0 million for the three months ended March 31, 2017, compared to $52.2 million for the three months ended March 31, 2016. Adjusted operating margin for the three months ended March 31, 2017, was 20.6% compared to 21.0% for the same period in 2016.

The Company reported net income for the three months ended March 31, 2017 of $21.2 million, resulting in diluted earnings per share of $0.38, compared to $17.4 million, or $0.31 per diluted share, for the three months ended March 31, 2016. Adjusted net income for the three months ended March 31, 2017 was $33.1 million, or $0.60 per diluted share, compared to $32.5 million, or $0.58 per diluted share, for the same period in 2016.

Adjusted EBITDA for the three months ended March 31, 2017 increased to $58.1 million, up from $57.1 million for the three months ended March 31, 2016. For the three months ended March 31, 2017, adjusted EBITDA margin was 23.1%, compared to 22.9% for the same period in 2016.

Important disclosures about and reconciliations of non-GAAP measures, including adjusted income from operations, adjusted operating margin, adjusted net income and adjusted diluted earnings per share, EBITDA and adjusted EBITDA, to the corresponding GAAP measures are provided below.

**New Business Awards and Backlog**

Backlog grew by 12.2% to $2.10 billion as of March 31, 2017, compared to $1.87 billion as of March 31, 2016. For the three months ended March 31, 2017, fluctuations in foreign currency exchange rates resulted in a favorable impact on our March 31, 2017 backlog in the amount of $7.1 million, primarily due to the strengthening of the Euro against the U.S. dollar. Net new business awards grew 19.0% to $359.9 million for the three months ended March 31, 2017, representing a book-to-bill ratio of 1.4x, compared to $302.4 million for the three months ended March 31, 2016.

**Business Outlook**

The Company's full-year guidance for 2017 is outlined in the following table. The guidance takes into account a number of factors, including current sales pipeline, approximately $705 million of existing backlog expected to translate into revenue in 2017, and our expectations for additional net new awards during 2017. Further, our guidance is based on current foreign currency exchange rates, current interest rates and our expected tax rates, and does not take into account the effects of any future stock repurchases.

| | Guidance Issued 5/10/2017 | | Guidance Issued 2/28/2017 | |
| --- | --- | --- | --- | --- |
| | Low | High | Low | High |
| Net service revenue | $ 1,040 million | $ 1,070 million | $ 1,030 million | $ 1,100 million |
| GAAP diluted EPS | $ 2.04 | $ 2.15 | $ 1.94 | $ 2.10 |
| Adjusted diluted EPS | $ 2.66 | $ 2.74 | $ 2.63 | $ 2.75 |

22.     On May 10, 2017, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2017.  The 10-Q was signed by defendant Rush and reaffirmed the Company's statements about its financial results contained in the press release issued on May 10, 2017.

23.     On July 27, 2017, the Company issued a press release entitled "INC Research Reports Second Quarter 2017 Results."  Therein, the Company, in relevant part, stated:

"INC delivered a second consecutive quarter of record gross and net awards, building on our momentum from the first quarter," said Chief Executive Officer Alistair Macdonald. "We continue to see strong demand among small to mid-sized customers and are enhancing our competitive position with larger biopharma, resulting in a robust backlog for the fourth quarter of this year and the full year 2018. This momentum is continuing into the third quarter, with INC delivering two awards from a large Chinese pharma company totaling $84 million, our largest-ever awards in China." He continued, "Accordingly, we are cautiously optimistic that we are on the path to returning the Company to double-digit organic revenue growth in 2018. We believe our continued strong awards demonstrate our customers' confidence in our strategy and our ability to execute through the integration with inVentiv Health."

Mr. Macdonald concluded, "We are pleased at the strategic opportunity the merger with inVentiv presents for our customers, shareholders and employees, as well as the tremendous progress our teams are making toward transition planning. We look forward to closing the transaction and the enhanced global capability and value we will offer through our new combined company."

**Second Quarter 2017 Results**

Net service revenue for the three months ended June 30, 2017 was relatively flat at $258.1 million, compared to net service revenue of $258.8 million for the three months ended June 30, 2016. For the six months ended June 30, 2017, net service revenue increased by $2.4 million, or 0.5%, to $510.2 million from $507.8 million for the six months ended June 30, 2016. For both the three and six months ended June 30, 2017, our net service revenue remained relatively consistent with the same periods in the prior year. This was primarily the result of weak net new business awards in the fourth quarter of 2016, as well as customer and regulatory delays, among other factors, impacting awarded projects. During the three and six months ended June 30, 2017, fluctuations in foreign currency exchange rates resulted in an unfavorable impact of $4.6 million and $8.1 million, respectively, on net service revenue as compared to the three and six months ended June 30, 2016. On a constant currency basis, revenue grew by approximately 2.0% during both the three and six months ended June 30, 2017, compared to the prior year.

Income from operations for the three months ended June 30, 2017 decreased by 4.2% to $10.3 million, from $39.7 million for the three months ended June 30, 2016. Income from operations for the six months ended June 30, 2017 decreased by 37.6% to $45.0 million, compared to $72.2 million for the six months ended June 30, 2016. Operating margins for the three and six months ended June 30, 2017 were 4.0% and 8.8%, respectively, compared to 15.3% and 14.2%, respectively, for the same periods in 2016. Operating income and related margins were negatively impacted in the three and six months periods primarily due to transaction expenses associated with our pending merger with inVentiv Health.

The Company's income from operations includes certain expenses and transactions that it believes are not representative of its core operations. Excluding these items, adjusted income from operations decreased to $53.7 million and $105.7 million for the three and six months ended June 30, 2017, respectively, compared to $55.0 million and $107.2 million for the three and six months ended June 30, 2016, respectively. Adjusted operating margins for the three and six months ended June 30, 2017, were 20.8% and 20.7%, respectively, compared to 21.3% and 21.1%, respectively, for the same periods in 2016.

The Company reported net income for the three months ended June 30, 2017 of $3.4 million, resulting in diluted earnings per share of $0.06, compared to $30.4 million, or $0.54 per diluted share, for the three months ended June 30, 2016. The Company reported net income for the six months ended June 30, 2017 of $24.6 million, resulting in diluted earnings per share of $0.45, compared to $47.8 million, or $0.85 per diluted share, for the six months ended June 30, 2016. Adjusted net income for the three months ended June 30, 2017 was $35.1 million, or $0.64 per diluted share, compared to $34.3 million, or $0.61 per diluted share, for the same period in 2016. Adjusted net income for the six months ended June 30, 2017 was $68.2 million, or $1.24 per diluted share, compared to $66.8 million, or $1.19 per diluted share, for the same period in 2016.

Adjusted EBITDA for the three months ended June 30, 2017 remained relatively consistent at $59.8 million, compared to $60.1 million for the three months ended June 30, 2016. Adjusted EBITDA for the six months ended June 30, 2017 increased to $117.9 million, up from $117.1 million for the six months ended June 30, 2016. For both the three-month periods ended June 30, 2017 and 2016, adjusted EBITDA margin was 23.2%. For both the six-month periods ended June 30, 2017 and 2016, adjusted EBITDA margin was 23.1%.

Important disclosures about and reconciliations of non-GAAP measures, including adjusted income from operations, adjusted operating margin, adjusted net income and adjusted diluted earnings per share, EBITDA and adjusted EBITDA, to the corresponding GAAP measures are provided below.

**New Business Awards and Backlog**

Backlog grew by 20.1% to $2.29 billion as of June 30, 2017, compared to $1.91 billion as of June 30, 2016. For the three and six months ended June 30, 2017, fluctuations in foreign currency exchange rates resulted in a favorable impact on our June 30, 2017 backlog in the amount of $23.4 million and $30.5 million, respectively, primarily due to the strengthening of the Euro against the U.S. dollar. Net new business awards grew 40.3% to $423.8 million for the three months ended June 30, 2017, representing a book-to-bill ratio of 1.6x, compared to $302.1 million for the three months ended June 30, 2016. Net new business awards grew 29.7% to $783.8 million for the six months ended June 30, 2017, representing a book-to-bill ratio of 1.5x, compared to $604.4 million for the six months ended June 30, 2016.

24.     On July 27, 2017, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2017. The 10-Q was signed by defendant Rush and reaffirmed the Company's statements about its financial results contained in the press release issued on July 27, 2017.

25.     On August 1, 2017, the Company issued a press release entitled "INC Research and inVentiv Health Announce Successful Completion of Merger." Therein, the Company, in relevant part, stated:

INC Research Holdings, Inc. (Nasdaq:INCR), a leading global Phase I-IV Contract Research Organization ("CRO"), and inVentiv Health, Inc., a leading, privately held global CRO and Contract Commercial Organization ("CCO"), today announced the successful completion of their previously announced merger. The combination creates the only fully integrated biopharmaceutical solutions organization, including an end-to-end CRO and CCO. INC Research/inVentiv Health will continue to trade on the Nasdaq Global Select Market under the symbol "INCR." The combined company will be known as INC Research/inVentiv Health on an interim basis until a relaunch under a new brand

in 2018.

Alistair Macdonald, Chief Executive Officer, INC Research/inVentiv Health, said, "The closing of this deal marks the beginning of an industry-changing new company, purpose-built to achieve the singular goal of accelerating biopharmaceutical performance. INC Research/inVentiv Health will address new market realities through shared clinical and commercial expertise, data and insights to meet the needs of biopharmaceutical companies of all sizes. This strategic combination enhances our ability to facilitate approvals and product launches in multiple markets worldwide, and the value we offer to employees, customers and our shareholders."

Michael Bell, Executive Chairman of the Board of Directors and President, Commercial Division, INC Research/inVentiv Health, added, "With the industry's most comprehensive clinical and commercial solutions continuum, the Board and I are confident in the company's ability to meet the needs of biopharmaceutical companies who are navigating an increasingly complex marketplace. Customers will benefit from enhanced global scale, deep therapeutic alignment and integrated solutions, including market access and Real World Evidence. We are pleased with transition progress to date, look forward to supporting our talented management team and are committed to enabling our customers to speed the delivery of therapies to the patients who need them most."

**Management and Governance**
INC Research/inVentiv Health is led by an established leadership team that reflects the strengths and capabilities of both companies. Alistair Macdonald is Chief Executive Officer, previously serving as Chief Executive Officer of INC Research. Greg Rush is Chief Financial Officer, previously serving as Executive Vice President and Chief Financial Officer of INC Research. Michael Bell, Chief Executive Officer of inVentiv Health before the merger, is Executive Chairman of the Board of Directors and President, Commercial Division.

26.     The above statements identified in ¶¶20-25 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose: (1) that the Merger was not providing the benefit that Defendants stated it would; (2) that inVentiv was underperforming; (3) that, as a result, the Company's 2017 financial performance would be negatively impacted; and (4) that, as a result of the foregoing, Defendants' statements about INCR's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

27.     On November 9, 2017, the Company reported Q3 2017 results that fell far below

investors' expectations, including a Q3 net loss from operations of $88.9 million, compared to income from operations of $39.4 million for Q3 2016.  In greater part, the Company stated:

> INC Research (NASDAQ:INCR), which, following the completion of the merger on August 1, 2017 with inVentiv Health ("the Merger"), we refer to as INC Research/inVentiv Health ("the Company"), the only fully-integrated biopharmaceutical solutions organization combining a CRO and a CCO (Contract Commercial Organization), today reported financial results for the third quarter and year-to-date periods ended September 30, 2017. To aid investors and analysts with year-over-year comparability of results for the merged business, we are including certain "Combined Company" metrics that represent combined financial information of INC Research and inVentiv Health as if the Merger had taken place on January 1, 2016, with conforming adjustments to the current year presentation. Please refer to the "Use of Non-GAAP Financial Measures" and "Reconciliation of GAAP to Combined Company Non-GAAP Measures" included in this press release and accompanying tables for important disclosures about non-GAAP measures and a reconciliation of these measures to the nearest GAAP measure.

> "We've experienced a quarter of rapid evolution as we achieve integration milestones at an accelerated pace, and we have significant customer interest in our unique, integrated business model. By combining clinical and commercial insights to deliver Real-World Evidence/late phase capabilities and full commercialization, we're seeing an increasing interest from customers for our high-value solutions in a highly competitive market," said Chief Executive Officer Alistair Macdonald.

> "In the Clinical segment, our momentum continues with another strong quarter of net awards, illustrating our ability to leverage our complementary customer bases, delivery platforms, and market approaches. While our Commercial segment performance was lower than expected, over time we expect this to improve with potentially more quarterly variability than our CRO business. Specifically, we remain confident in our ability to deliver on our long-term Commercial growth through our market leading offering in an improving sales environment  stemming from increased drug approvals and related new drug launches and expectations that this trend will continue over the near and mid-term."

> "We're confident in unlocking meaningful value from this combination and remain on target to achieve the $100 million of annual savings by year three while building market momentum. All of this is made possible by the dedicated efforts of our transition management team and the thousands of INC Research/inVentiv Health employees worldwide who are committed to speeding the delivery of important therapies for our customers and the patients they serve."

**Third Quarter 2017 Results**

Net service revenue for the three months ended September 30, 2017 increased by

$332.7 million, or 128.2%, to $592.2 million from $259.6 million for the three months ended September 30, 2016. For the nine months ended September 30, 2017, net service revenue increased by $335.0 million, or 43.7%, to $1.10 billion from $767.4 million for the nine months ended September 30, 2016. Our total net service revenue increased compared to the same periods in the prior year, solely due to the Merger, which accounted for $340.8 million of the increase for both the three and nine months ended September 30, 2017. This increase was partially offset by a decline in revenues due to continued customer and regulatory delays, which we believe are transitory in nature. In addition, under purchase accounting rules, approximately $12.7 million of inVentiv Health deferred revenue, which otherwise would have been recognized as revenue in the three months ended September 30, 2017, was eliminated. The impact of fluctuations in foreign currency exchange rates on net service revenue was not material for the three months ended September 30, 2017. During the nine months ended September 30, 2017, fluctuations in foreign currency exchange rates resulted in an unfavorable impact of $7.1 million on net service revenue as compared to the nine months ended September 30, 2016.

Combined Company non-GAAP net service revenue for the three months ended September 30, 2017 decreased by $48.7 million, or 6.0%, to $766.6 million from $815.2 million for the three months ended September 30, 2016, respectively. Combined Company non-GAAP net service revenue for the nine months ended September 30, 2017 decreased by $93.8 million, or 3.9%, to $2.33 billion from $2.43 billion for the three months ended September 30, 2016, respectively. Combined Company non-GAAP net service revenue for the three and nine months ended September 30, 2017 includes revenue of $13.2 million and $27.0 million, respectively, eliminated as part of purchase accounting.

For the three and nine months ended September 30, 2017, our Combined Clinical Solutions Segment generated adjusted net service revenue of $533.4 million and $1.58 billion, respectively, representing an increase of 2.6% for each period compared to $519.8 million and $1.54 billion for the three and nine months ended September 30, 2016, respectively. Our Combined Clinical Solutions segment revenue increased primarily due to our strong bookings in 2017, partially offset by continued customer delays.

For the three and nine months ended September 30, 2017, our Combined Commercial Solutions Segment generated net service revenue of $233.2 million and $752.9 million, respectively, compared to $295.5 million and $887.3 million, during the three and nine months ended September 30, 2016, respectively. Our Combined Commercial Solutions Segment revenue declined by 21.1% and 15.1%, respectively, for the three and nine months ended September 30, 2017 compared to the same periods in 2016. The decrease in revenue was primarily due to (i) the impact of cancellations at the end of 2016, (ii) further cancellations in third quarter of 2017, and (iii) lower new drug approval activity during 2016.

For the three and nine months ended September 30, 2017, we generated a loss from operations of $88.9 million and $43.9 million, respectively, compared to

income from operations of $39.4 million and $111.6 million for the three and nine months ended September 30, 2016, respectively.  Our operating results for the three and nine months ended September 30, 2017 were impacted by (i) Merger-related transaction expenses of $84.3 million and $108.1 million, respectively, (ii) an impairment charge of $30.0 million recorded in the third quarter of 2017 with respect to the INC Research trademark and intangible asset, and (iii) an increase in amortization expense of $41.9 million in both periods due to the acquisition of intangible assets as a result of the Merger.

Our income (loss) from operations includes expenses associated with certain transactions that we believe are not representative of our core operations. Excluding these items, adjusted Combined Company non-GAAP income from operations decreased to $120.5 million and $366.5 million for the three and nine months ended September 30, 2017, respectively, compared to $133.7 million and $382.4 million for the three and nine months ended September 30, 2016, respectively. Adjusted operating margin for both the three and nine months ended September 30, 2017, was 15.7%, compared to 16.4% and 15.8%, respectively, for the same periods in 2016.

For the three and nine months ended September 30, 2017, we reported a net loss of $148.0 million and $123.4 million, respectively, resulting in a diluted loss per share of $1.70 and $1.90, respectively. For the three and nine months ended September 30, 2016, we reported net income of $27.3 million and $75.1 million, respectively, or $0.49 and $1.35 per diluted share, respectively. Combined Company adjusted net income for the three and nine months ended September 30, 2017 was $56.5 million and $164.2 million, or $0.54 and $1.56 per diluted share, respectively, compared to $49.2 million and $135.2 million, or $0.47 and $1.28 per diluted share, for the three and nine months ended September 30, 2016, respectively.

Combined Company adjusted EBITDA for the three and nine months ended September 30, 2017 was $138.9 million and $424.5 million, respectively, compared to $153.1 million and $439.4 million for the three and nine months ended September 30, 2016, respectively. For the three-month periods ended September 30, 2017 and 2016, adjusted EBITDA margin was 18.1% and 18.8%, respectively. For the nine-month periods ended September 30, 2017 and 2016, adjusted EBITDA margin was 18.2% and 18.1%, respectively.

\*     \*     \*

**Business Outlook**
The Company's fourth quarter guidance for 2017 is outlined in the following table. The guidance takes into account a number of factors, including current sales pipeline, trends in cancellations and delays, and our expectations for commercial sales during the fourth quarter of 2017. Furthermore, our guidance is based on current foreign currency exchange rates, current interest rates, and our expected tax rates.

|  | Low | High |
|---|---|---|
| Net service revenue | $  738.0 million | $  768.0 million |
| Adjusted net service revenue | 750.0 million | 780.0 million |
|    Clinical Solutions adjusted net service revenue | 525.0 million | 540.0 million |
|    Commercial Solutions adjusted net service revenue | 225.0 million | 240.0 million |
| Adjusted EBITDA | 137.0 million | 147.0 million |
| Adjusted net income | 56.0 million | 63.5 million |
| GAAP diluted EPS | $  (0.25) | $  (0.14) |
| Adjusted diluted EPS | $  0.52 | $  0.60 |

28.     In response, William Blair analyst, John Kreger, criticized the Company's performance, calling the Q3 results "sloppy." Kreger also criticized the Company's prospects, noting that the Company's fourth quarter guidance was "worrisome" given the challenges that inVentiv's commercial business had faced, and that "[t]he guidance implies that clinical revenues will be flat and commercial revenues will be down 21% year-over-year."  In greater part, Kreger stated:

> INC Research/inVentiv Health reported third-quarter results on Thursday morning, November 9, for the first time as a combined company. The numbers were sloppy, but it appears that the company's EPS—whether on a pro forma or an as-reported basis—fell short of our estimate, and revenues came in lower than we expected. On an as-reported basis, earnings came in at $0.61 compared with our $0.63 estimate, and the company provided a pro forma EPS number of $0.54. On a pro forma basis, we had expected clinical revenues of $532.8 million, and the company's pro forma clinical revenues of $533.4 million were right in line with our estimate. However, pro forma commercial revenues came in $13.5 million below our estimate of $246.7 million.
>
> Management provided guidance for the fourth quarter of 2017 that came in lower than we had anticipated. The guidance implies that clinical revenues will be flat and commercial revenues will be down 21% year-over-year. We view this as worrisome given the challenges that inVentiv's commercial business has faced so far this year. In aggregate, the revenue guidance is $55 million below our target, using the midpoint and excluding the impact of $12 million in purchase accounting. The fourth-quarter earnings guidance also fell well below our estimates; we suspected that earnings guidance would come in lighter given some of the moving parts as the merger integration begins, but EPS guidance of between $0.52 and $0.60 fell well below our estimate of $0.74 and the consensus estimate of $0.72 for the quarter. We hope to glean more information regarding the 2018 outlook on this morning's call.

29.     On this news, the Company's stock price fell $16.35 per share, or 28.4%, to close

at $41.15 per share on November 9, 2017, on unusually heavy trading volume. The Company's share price continued to fall over the next three trading sessions, closing on November 14, 2017 at $34.35 per share, a total decline of $23.15 per share, or 40.3%.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired INCR securities between May 10, 2017, and November 9, 2017, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, INCR's common stock actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of INCR shares were traded publicly during the Class Period on the NASDAQ.  As of November 2, 2017, INCR had 104,344,972 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by INCR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of INCR; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

35.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

36.      The market for INCR's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, INCR's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired INCR's securities relying upon the integrity of the market price of the Company's securities and market information relating to INCR, and have been damaged thereby.

37.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of INCR's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about INCR's business, operations, and prospects as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about INCR's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

39.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

40.     During the Class Period, Plaintiff and the Class purchased INCR's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

41.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding INCR, their control over,

and/or receipt and/or modification of INCR's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning INCR, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

42.     The market for INCR's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, INCR's securities traded at artificially inflated prices during the Class Period.  On June 19, 2017, the Company's stock price closed at a Class Period high of $60.65 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of INCR's securities and market information relating to INCR, and have been damaged thereby.

43.     During the Class Period, the artificial inflation of INCR's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about INCR's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of INCR and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

44.     At all relevant times, the market for INCR's securities was an efficient market for the following reasons, among others:

(a)     INCR stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, INCR filed periodic public reports with the SEC and/or the

NASDAQ;

(c)     INCR regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     INCR was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

45.     As a result of the foregoing, the market for INCR's securities promptly digested current information regarding INCR from all publicly available sources and reflected such information in INCR's stock price. Under these circumstances, all purchasers of INCR's securities during the Class Period suffered similar injury through their purchase of INCR's securities at artificially inflated prices and a presumption of reliance applies.

46.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## <u>NO SAFE HARBOR</u>

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of INCR who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

48.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

49.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase INCR's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

50.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for INCR's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about INCR's financial well-being and prospects, as specified herein.

52.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of INCR's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about INCR and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

53.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

54.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing INCR's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of INCR's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired INCR's securities during the Class Period at artificially high prices and were damaged thereby.

56.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that INCR was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their INCR securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     Individual Defendants acted as controlling persons of INCR within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, INCR and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the

Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 1, 2017

**GLANCY PRONGAY & MURRAY LLP**


By:  *s/ Lesley F. Portnoy*
Lesley F. Portnoy (LP-1941)
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email:  lportnoy@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway, Suite 410
Atlanta. GA  30338
Telephone: 770/392-0090
770/392-0029 (fax)

*Counsel for Plaintiff*

DocuSign Envelope ID: 86006BD9-7C00-4589-8F83-A0D28CE60D11

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows - **List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| INCR | November 7th, 2017 | 3 | $58.35 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

NA

DocuSign Envelope ID: 86006BD9-7C00-4589-8F83-A0D28CE60D11

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___9th___ day of ___November___, 2017 in ____Miami____, ____Florida____.
                                                                    City              State

(Signature) X _____ _Elier Bermudez_ _____
                         DocuSigned by:
                         22AB31AEF8F846A...

(Print Name) _____ Elier Bermudez _____
                          First                Last